<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     CASE NO. 14-20488-CR-JLK-1
 3                             14-20488-CR-JLK-2

 4
     UNITED STATES OF AMERICA           Miami, Florida
 5
                                        Wednesday
 6         vs.                          January 7, 2015

 7
     LI VALDES and
 8   ADIEL SANCHEZ BREY                 Scheduled 0:15 a.m.
                                        10:27 a.m. to 12:17 p.m.
 9   -------------------------------------------------------

10                      SENTENCING HEARING

11        BEFORE THE HONORABLE JAMES LAWRENCE KING
             UNITED STATES DISTRICT SENIOR JUDGE
12                      COURTROOM 10-6

13   APPEARANCES:

14
     FOR THE GOVERNMENT:       MARTON GYIRES, ESQ.
15                             Assistant United States Attorney
                               United States Attorney's Office
16                             99 Northeast 4th Street, Room 617
                               Miami, Florida  33132
17
     FOR THE DEFENDANT         FRANK QUINTERO, JR., ESQ.
18   ADIEL SANCHEZ BREY:       Quintero Broche, P.A.
                               75 Valencia Avenue
19                             Suite 800
                               Coral Gables, Florida  33134
20
     FOR THE DEFENDANT         STEWART GLENN ABRAMS, ESQ.
21   LI VALDES:                Federal Public Defender's Office
                               150 W. Flagler Street
22                             Miami, Florida  33130-1556

23   REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
                               Official Federal Court Reporter
24                             United States District Court
                               400 North Miami Avenue, N809
25                             Miami, Florida 33128
</pre>

2

1                     I N D E X

2    WITNESS                                      PAGE

3

4    GOVERNMENT'S EVIDENCE

5

6    DANIEL WILLENBRING, Ph.D.

7    Direct Examination by Mr. Gyires            11

8    Cross-Examination by Mr. Quintero           15

9    CASSANDRA PRIOLEAU, Ph.D.
10   Direct Examination by Mr. Gyires            19
11   Cross-Examination by Mr. Quintero           23
12   Cross-Examination by Mr. Abrams             27
13   Redirect Examination by Mr. Gyires          28
14

15

16

17

18

19

20

21

22

23

24

25

1              (Call to the order of the Court.)

2         THE COURT:  I've reviewed the pleadings in the matter

3    of the United States versus Valdes and Brey, and I note that

4    the defendants -- let's get the appearance of everybody here.

5         Let's see.  We've got Mr. Gyires?

6         MR. GYIRES:  Yes, Your Honor.  Marton Gyires for the

7    United States.

8         THE COURT:  Mr. Gyires for the United States.

9    Mr. Abrams for one defendant, Mr. Quintero for the other.

10        MR. QUINTERO:  Your Honor --

11        THE COURT:  Now, there's a motion to strike the

12   testimony of the two proposed expert witnesses under a Daubert

13   objection.  Primarily, the objection centers upon whether or

14   not the testimony of the two witnesses would be helpful to the

15   Court in making a determination of the potency and the other

16   requisites -- the three requisites of the applicability of the

17   sentencing guidelines to the substances to which the defendants

18   have pled guilty and the effect that has on the sentencing

19   guideline range.

20        The Court, reviewing this, has concluded -- I can hear

21   from you on this point, but I think that the testimony of the

22   witnesses would be helpful to the Court in making a

23   determination upon the substances and the value or the

24   numerical value they should or should not have with respect to

25   sentencing guidelines.

1      So I'm prepared, unless the -- I will hear from -- I

2  will hear briefly from each defendant if there's anything

3  further.

4      Basically, under Daubert, the question is, can it be

5  helpful to the Court.  Well, the chemical analysis with the

6  people who are familiar with these substances; that is, the

7  chemists who seem to be qualified professionally to give

8  opinions, certainly would be helpful to the Court.

9      Unless there's some objection to their professional

10 qualifications or something of the sort, it seems to me that

11 under the guideline -- under the law as set forth in the

12 Daubert Supreme Court decision of 10 or 12 years ago have been

13 met and they should be permitted to testify.

14     I'm prepared to go forward at this point, listen to

15 them, subject to cross-examination, where you can bring out the

16 fact -- and I'm sure they will admit that there are no criteria

17 right now involving these two substances and so on; but they

18 still would have evidence that, would be helpful to the Court

19 on the first two factors involved.

20     If that's not confusing enough for everybody, I can

21 elaborate further and make it more confusing for you.

22     But that's my basic tentative ruling.

23     Mr. Abrams, any -- reserving, to both of you, your

24 right -- or Mr. Quintero -- your right to raise this issue that

25 there are no statistical data on the third prong of the test.

1           MR. QUINTERO:  Your Honor, I think if the Court will

2   look at my memorandum, we actually stipulated to the first two

3   factors that the Government was asking concerning the three

4   prongs of the test.

5           THE COURT:  Yeah, but you guys are all familiar with

6   this -- these substances.  Let me turn to this.  I will get to

7   it.  See, I don't know the names of these things.  I certainly

8   don't know what effect they have on a person's body or

9   anything, I have no idea of that.

10          And this -- well, the chemical structure is similar to

11  methylone versus this other substance, which is something else.

12  You all are familiar with all that; I'm not.  This is -- so it

13  seems to me I'll listen to it and find out what they have to

14  say.

15          MR. QUINTERO:  If I may direct the Court to page four

16  of my memorandum -- supplemental sentencing/evidentiary hearing

17  memorandum and motion to strike the Government's expert

18  witnesses, page four, top paragraph, about the second sentence

19  down, it says:

20          "As set forth in defendant's objections to the PSR, the

21  undersigned counsel does not dispute the findings of the

22  Government's expert witnesses that ethylone is structurally

23  similar to MDEA and that its effects are similar to MDEA, MDMA

24  and methylone."

25          If the Court wants to go through and listen to the

1    exercise, fine; but I just want to let the Court know that

2    for -- to expedite, we agree that the substances are all

3    similar and all in the same family of substances, and the first

4    two factors of the three factors that this Court must determine

5    are not a problem.

6                The issue in this case is potency.

7                THE COURT:  What is the response of the Government?

8                You're talking about the chemical structure of

9    ethylone, E-T-H-Y-L-O-N-E, and the chemical structure of

10   methylone.

11               You're talking about the differences between MDEA and

12   some other substance here, and you're -- the only bone of

13   contention is -- and the parties agree to this, it's not in

14   dispute -- that there are currently no scientific data or

15   literature available to these two experts or anyone else that's

16   known to the parties at this point regarding the potency of

17   ethylone as opposed to this other chemical thing, whatever it

18   is.  And it seemed to me that the testimony of experts telling

19   me this might be helpful.

20               What's the Government's position?

21               MR. GYIRES:  Your Honor, again, I think everyone

22   understands that there are three factors.

23               THE COURT:  Yeah.

24               MR. GYIRES:  And if defense is willing -- I've tried

25   numerous times to come to stipulations on the first two

1    factors.  We can try to --

2         THE COURT:  They just said they have no objection and

3    they agree that if the witnesses testify, the first two factors

4    would be satisfied.  Is that correct?

5         MR. QUINTERO:  Yes, sir.  We even put it in writing.

6         THE COURT:  All right.  They agree.

7         Now that leaves the potency, which I don't know

8    anything about, you don't know anything about.  I'm sure that

9    Mr. Abrams doesn't have a clue either.  I've known him for many

10   years, I doubt that he's tried out these two substances.  He's

11   very loyal to his clients, but I doubt that he's sniffed and

12   gobbled them up, whatever they do with this crap.

13        I don't know.  Nobody knows.

14        About the potency now, the Government says you're

15   objecting to the PSI, which the probation office has

16   recommended on their research a consistency of -- or an

17   evaluation of -- wait a minute, hold on right here -- that

18   ethylone is not specified -- specifically listed in the

19   guidelines.

20        The Government agrees or submits that ethylone,

21   E-T-H-Y-L-O-N-E, should be treated the same as MDEA -- whatever

22   that is -- as being comparison of the most closely-related

23   controlled substance in the guidelines.

24        MDEA carries a ratio of 1 to 500 and so should

25   ethylone, according to the Government.

1          So you're objecting to the probation report, which

2   assigned a ratio of 1.25.

3          Aren't you glad we have sentencing guidelines in all

4   this mess to deal with, instead of dealing with these human

5   beings, whether they're married or have children or good people

6   or bad people or whatever?  It's wonderful - this nonsense -

7   we're getting into after all these years.  All right.

8          But getting back to that, that's where we stand.

9          So it's your job to prove that the more comparative

10  analysis is -- results in a ratio of 1 to 500, instead of 1 to

11  250, as the probation officer has recommended.

12         Now that's what we're arguing about.

13         Now, they're agreeable; and you're saying, Judge, base

14  it on all three factors, don't just base it on the potency.

15         Fine, that's argument.  I'll listen to you.

16         But the factual basis for the record going forward has

17  to be established in a courtroom with testimony, unless there's

18  a stipulation.

19         Obviously, this morning, if not before -- you say you

20  tried before, they say they told you before, whatever, I'm not

21  going to get into that argument.  It doesn't matter.

22         Today the defendants, both of them -- and I want them

23  to correct me if I'm wrong -- they stipulate to the first two

24  factors.  They stipulate that the Government is correct on

25  that, you don't have to prove it.

1          MR. ABRAMS:  Yes.

2          THE COURT:  But the bone of contention is

3   interpretation to give to that.

4          I can tell you know what your argument's going to be --

5   I'm guessing, guessing; that's used loosely in these pleadings.

6   Your argument's going to be, well, this is more similar to MDMA

7   than it is to something else and something else, and they're

8   going to say no, it isn't.

9          And we're going to have to base it -- you're going to

10  argue it should be based on all three factors, and they're

11  going to say, No, Judge, if one factor's missing, base it on

12  this.

13         At the end of the day, I've got to listen to you and

14  find out what your -- on why your arguments are both ways.

15         But getting back to the trial of the matter -- or the

16  evidence of the matter, the two chemists are here.

17         Now, what is the Government's now position; and then

18  I'll ask Mr. Quintero his position or their positions.

19         Where are we?  Should we listen to the chemists or not?

20         MR. GYIRES:  I think we should, very briefly, because

21  they can explain why the potency -- they can explain the

22  potency issue.  Their testimony will be much, much shorter.

23         THE COURT:  That's still an issue.

24         MR. QUINTERO:  That's the problem, Judge.

25         THE COURT:  That's not an issue?

```
 1          MR. QUINTERO:  Yes, that is the issue.  Potency is an

 2   issue.  The experts are going to testify about potency when

 3   that's no statistical data and there's no information.  Then

 4   that goes astray of Daubert because there's nothing to base

 5   their opinion on, because it's a guess.

 6          THE COURT:  The objection is overruled.  I will hear

 7   from them.  Clearly, the evidence will be helpful in making a

 8   determination on the three issues, one way or the other.  I

 9   don't know what they're going to say.  But one way or the

10   other, we get a record first and then you argue from the

11   record.  They will be subject to full cross-examination, you

12   can develop your positions.

13          Call your first witness.

14          The motion to strike is denied under Daubert.

15          MR. GYIRES:  The Government calls Daniel Willenbring.

16          THE COURT:  Marshal, show him where to sit and have him

17   be sworn.

18          COURTROOM DEPUTY:  Raise your right hand.

19          Do you solemnly swear that the testimony you're about

20   to give is the truth, the whole truth, and nothing but the

21   truth, so help you God?

22          THE WITNESS:  I do.

23          COURTROOM DEPUTY:  Thank you.  You may be seated.

24          And will you please state your name and spell your last

25   name for the record.
```

1              THE WITNESS:  Dan Willenbring, W-I-L-L-E-N-B-R-I-N-G.

2              COURTROOM DEPUTY:  Thank you.

3    Thereupon,

4                     DANIEL WILLENBRING, Ph.D.

5    having been first duly sworn, was examined and testified as

6    follows:

7                        DIRECT EXAMINATION

8    BY MR. GYIRES:

9    Q.  Hi.  Are you employed, sir?

10   A.  With the Drug Enforcement Administration.

11   Q.  Doing what?

12   A.  I am a drug science specialist, and specifically in the

13   chemistry part of the Office of Diversion Control.

14   Q.  And what do you do day-to-day?

15   A.  I do control status evaluations.  So companies and

16   researchers will write in to us and ask us the control status

17   of a substance, and we determine whether or not it's controlled

18   under the Controlled Substances Act.

19   Q.  And do you also analyze chemical structures and help

20   explain chemical structures and similarities of certain drugs

21   to each other?

22   A.  Yes.  So those control status evaluations are all based on

23   structure, and I also look at structure for cases like this for

24   sentencing and for analog cases.

25   Q.  Can you tell us about your education briefly?

Direct - Daniel Willenbring, Ph.D.                    12

 1   A.   I have a Bachelor's degree in chemistry and computer

 2   science, and I have a Ph.D. in chemistry.

 3   Q.   You got that in 2008, the Ph.D.?

 4   A.   Correct.

 5   Q.   And, briefly, take us through some of your professional

 6   experience.

 7   A.   After graduate school, I went to Pittsburgh and did a

 8   post-doctoral fellowship at the University of Pittsburgh in the

 9   Department of Anesthesiology.  And from there I moved to Boston

10   and I taught college for a short time and worked at a company

11   that did contract research for pharmaceutical companies.

12   Q.   All right.  And do you have any publications that have been

13   peer reviewed?

14   A.   I have a number of peer-reviewed publications.

15        MR. GYIRES:  Okay.  At this time, the Government would

16   ask the Court to tender the witness as an expert witness,

17   Your Honor.

18        THE COURT:  Any objections, Mr. Abrams?

19        MR. ABRAMS:  No, Your Honor.

20        THE COURT:  Any objections to his expert -- to his

21   expertise?

22        MR. QUINTERO:  No, Your Honor.

23        THE COURT:  All right.  The Court declares him to be an

24   expert in his field and qualified to express opinion testimony

25   under the guidelines of the Daubert case.

Direct - Daniel Willenbring, Ph.D.                     13

1           MR. GYIRES:  Thank you, Your Honor.

2    BY MR. GYIRES:

3    Q.   Doctor, can you -- are you familiar with the chemicals that

4    are listed in the United States sentencing guidelines?

5    A.   I am.

6    Q.   And are you familiar with the drug "ethylone?"

7    A.   Yes.

8    Q.   Are you familiar with the drug that's called "MDEA?"

9    A.   I am.

10   Q.   And what about the drug "methylone?"

11   A.   I am.

12   Q.   Is methylone specifically listed in the guidelines?

13   A.   It is not.

14   Q.   Is MDEA specifically listed?

15   A.   Yes, it is.

16   Q.   Is ethylone specifically listed?

17   A.   No, it is not.

18   Q.   So only, of those three, MDEA is listed?

19   A.   Correct.

20   Q.   Okay.  Now -- and can you tell us what your conclusion is

21   as to the chemical structure of MDEA compared to ethylone?

22   A.   So when I evaluated those structures, I determined that

23   they were substantially similar in chemical structure.

24   Q.   Is there a drug that's listed in the guidelines that is a

25   better match than MDEA, ethylone?

Direct - Daniel Willenbring, Ph.D.                14

1   A.   No -- so the difference between ethylone and MDEA is a

2   single atom, it's called the beta Keto.   It's an oxygen atom

3   that's been added to MDEA to make it ethylone.

4   Q.   Okay.   So that's regarding chemical structure; right?

5   A.   Correct.

6   Q.   Let's turn to the issue of potency.   Do you have any

7   knowledge, personally, or are you aware of any studies that

8   shed any light as to the potency of ethylone?

9   A.   No.   So my field is chemistry, so potency is more of a

10  pharmacological science.

11  Q.   Have you, though, reviewed one of the exhibits filed by

12  defense in the pleadings, and that's an article written by

13  someone with the last name Tang and his colleagues that talk

14  about something called the "Limit of Detection?"

15  A.   I have read that, yes.

16  Q.   Does that article and the phrase "Limit of Detection" or

17  anything in that article tell us anything about the potency of

18  ethylone?

19  A.   No.   "Limit of detection" is an analytical chemistry term,

20  so it's the amount of drug you need to detect it using an

21  instrument.   It's completely separate from any biology.

22  Q.   So it has nothing to do with potency; is that fair to say?

23  A.   Correct.

24  Q.   Did you review any other pleadings that were filed by

25  defense?

1    A.   I have.  Most of them didn't relate to chemistry,

2    specifically.

3    Q.   Okay.  Did you see anything that talks about potency,

4    specifically?

5    A.   Again, that's not a chemistry question.

6              MR. GYIRES:  At this point, Your Honor, I'd pass the

7    witness to defense.

8              THE COURT:  Mr. Quintero?

9              MR. QUINTERO:  Yes, Your Honor, if it pleases the

10   Court.

11                        CROSS-EXAMINATION

12   BY MR. QUINTERO:

13   Q.   Good afternoon, sir.

14   A.   Hi.

15   Q.   You and I have never spoken before; correct?

16   A.   Correct.

17   Q.   Just so the Court is clear, MDEA, MDMA, methylone and

18   ethylone have the -- they all have the same basic chemical

19   composition; correct?

20   A.   They all have -- they're all in the same family of

21   substances, if you want to use that term, yes.

22   Q.   From a chemical standpoint?

23   A.   Correct, yes.

24   Q.   Now, you, yourself, have not participated in any research

25   regarding statistical data on any of these drugs; correct?

Cross - Daniel Willenbring, Ph.D.                    16

 1    A.   Correct.

 2    Q.   And you, yourself, have not done any clinical work on the

 3    potency of any of these drugs; correct?

 4    A.   Correct.

 5    Q.   And from a chemical standpoint, as you've testified,

 6    ethylone could be less potent, equally potent or more potent

 7    than, for example, methylone; correct?

 8    A.   You can't base the potency on the chemical structure.

 9    Q.   Well, my question to you is:  Is it possible that ethylone

10    could be less potent, equally potent or more potent than, for

11    example, methylone?

12    A.   Anything is possible, I mean, yes.

13    Q.   Do you have any information that would allow you to express

14    an opinion on the potency of ethylone as compared to methylone

15    or MDEA or MDMA?

16    A.   Again, my field is chemistry, and potency is not a

17    chemistry area, so I'm not qualified to give any opinions about

18    potency.

19    Q.   Tell the Court how potency is determined when it comes to

20    chemical substances.

21    A.   That would be a thing for a pharmacologist to explain.  As

22    a chemist, I don't deal with potency.

23    Q.   But would potency require clinical trials?

24    A.   I don't know.  That's outside my area of expertise.

25    Q.   Would potency require --

1          MR. GYIRES:  Your Honor, I object at this point.  The

2     next witness can answer these questions, not this one.

3          THE COURT:  He said he did not know -- let me hear the

4     full question.  What was the question -- next question going to

5     be?

6          MR. QUINTERO:  Honestly, I forgot.  Would the court

7     reporter please repeat it back to me.

8          (Thereupon, a portion of the record was read by the

9     reporter.)

10          THE WITNESS:  That's outside my field of expertise.

11     BY MR. QUINTERO:

12     Q.  I'm sorry?

13     A.  It's outside my area of expertise.

14     Q.  So you don't know?

15     A.  I don't know.

16     Q.  Basically, then, what you do is, you read research

17     materials that are provided to you and express an opinion to

18     the DEA concerning a chemical substance?

19     A.   I provide opinions in court regarding the structure of the

20     chemical substances.

21     Q.  Based on what?  In other words --

22     A.  Based on my expertise and training and the literature that

23     I read.

24     Q.  So you do not perform any laboratory tests on chemical

25     substances?

Cross - Daniel Willenbring, Ph.D.                    18

1    A.  Not in a laboratory.  I'm in an office.  I'm a

2    computational chemist.  I do do calculation on the chemical

3    structures.

4    Q.  My question is:  Do you analyze chemical substances in the

5    lab --

6    A.  No.

7    Q.  -- or do you just sit in your office and review materials

8    or reports that are submitted to you?

9    A.  I go and find reports and I collect the data, but I don't

10   have any instruments in my office.

11   Q.  So you review research documentation or clinical

12   documentation and then report it to the DEA as to your opinion

13   about all this stuff; correct?

14   A.  I don't review clinical documentation.  I review chemistry

15   information.

16           MR. QUINTERO:  Nothing else, Your Honor.

17           THE COURT:  Any questions, Mr. Abrams?

18           MR. ABRAMS:  No, sir.

19           THE COURT:  Any redirect?

20           MR. GYIRES:  No, Your Honor.

21           THE COURT:  You're excused, Doctor.  You may step down.

22           (Witness excused.)

23           THE COURT:  Do you have any other witnesses for the

24   Government?

25           MR. GYIRES:  The Government calls Dr. Cassandra

Direct - Cassandra Prioleau, Ph.D.                    19

```
 1    Prioleau.

 2            THE CLERK:  Raise your right hand.

 3            Do you solemnly swear that the testimony that you shall

 4    give will be the truth, the whole truth and nothing but the

 5    truth, so help you God?

 6            THE WITNESS:  Yes, I do.

 7            COURTROOM DEPUTY:  Thank you.  You may be seated.

 8            Would you please state your name and spell your last

 9    name for the record.

10            THE WITNESS:  My name is Cassandra Prioleau.  My last

11    name is spelled P, as in Paul, R-I-O-L-E-A-U.

12            COURTROOM DEPUTY:  Thank you.

13    Thereupon,

14                    CASSANDRA PRIOLEAU, Ph.D.

15    having been first duly sworn, was examined and testified as

16    follows:

17                         DIRECT EXAMINATION

18    BY MR. GYIRES:

19    Q.   Good morning, Doctor.  How are you employed?

20    A.   I work for the Drug Enforcement Administration.

21    Q.   What do you do?

22    A.   I am a drug science specialist, but my training is in

23    pharmacology.

24    Q.   What is "pharmacology?"

25    A.   "Pharmacology" is a study of how drugs work in the body.
```

Direct - Cassandra Prioleau, Ph.D.                    20

1   Q.   Can you take us through your education, please.

2   A.   I have a Bachelor of Science degree from the University of

3   Connecticut in chemistry.  And followed that, I have a Ph.D. in

4   pharmacology from the University of North Carolina.

5   Q.   What about your professional experience?

6   A.   I -- before -- after I received my Ph.D., I did

7   post-doctoral training.  In post-doctoral training, you work in

8   the laboratory.  You further what you've learned as a student.

9   You learn how to be an independent researcher.

10       After I did a post-doc, I did a -- actually, two post-docs.

11  I got employment at the Consumer Products Safety Commission,

12  and finally after that I got employment at the Drug Enforcement

13  Administration.

14  Q.   All right.

15       MR. GYIRES:  At this point, Your Honor, the Government

16  would tender the witness as an expert in pharmacology.

17       MR. QUINTERO:  Other than my previous objection, no,

18  Your Honor, she's qualified to testify.

19       THE COURT:  The Court finds, declares, the witness to

20  be an expert witness in her field and, therefore, entitled to

21  express opinion-type testimony.

22       MR. GYIRES:  Thank you, Your Honor.

23  BY MR. GYIRES:

24  Q.   Are you familiar, ma'am, with the drugs ethylone, methylone

25  and MDEA?

Direct - Cassandra Prioleau, Ph.D.                21

1   A.   Yes.

2   Q.   What is your conclusion as to the pharmacological

3   relationship between ethylone and MDEA?

4   A.   Ethylone has -- is expected to have a stimulant effect in

5   the central nervous system that is substantially similar to

6   that of MDEA.

7   Q.   All right.  Now, did you review -- are you familiar with an

8   article filed by defense that was written by similar and other

9   individuals regarding these drugs?

10  A.   Yes.

11  Q.   Does that article, in your opinion, express any information

12  on the potency of ethylone?

13  A.   It talks about potency, in terms of the study that they --

14  the in vitro study that they performed.  An in vitro study is a

15  study that's done outside of a living organism, for example, in

16  a test tube; but it doesn't give an accurate representation of

17  the potency that you would see in the user.

18  Q.   In a human being?

19  A.   Correct.

20  Q.   Okay.  So if the issue is how potent is this drug in a

21  human being, does that study, that similar study, help us in

22  any way?

23  A.   No.  It gives us information on how the drug works; but in

24  terms of the potency related to humans, it's -- would not give

25  you an accurate representation of the potency in the user, in a

Direct - Cassandra Prioleau, Ph.D.                22

1    human.

2    Q.  Can you give us examples of the different categories or

3    ways in which potency is tested for certain chemicals or drugs?

4    A.  If you're talking in terms of humans, it would be clinical

5    studies where you would actually do it -- do clinical studies

6    in humans.  And if you don't have that -- because some drugs

7    are too dangerous to be tested in humans -- you have animal

8    studies in which you use the whole animal.  These are in vivo

9    studies.  And from those studies you would get an estimate --

10   you can get an estimate of the potency that you can extrapolate

11   to humans.

12   Q.  And are you familiar with any studies, reliable studies or

13   any studies at all, that have done animal or human studies of

14   potency with the drug ethylone?

15   A.  No, I am not.

16   Q.  Is it possible that ethylone is more potent than MDEA or

17   methylone?

18   A.  It's possible.

19   Q.  Is it possible that it's less potent?

20   A.  Yes, it's possible.

21   Q.  Is it possible that it's equally potent?

22   A.  Yes, it's possible.

23        MR. GYIRES:  Just one second.  Let me make sure I asked

24   all my questions, Your Honor.

25        I pass the witness for the defense, Your Honor.

Cross - Cassandra Prioleau, Ph.D.                23

```
 1              THE COURT:  Mr. Quintero.
 2              MR. QUINTERO:  Yes, Your Honor, thank you.  If it
 3  please the Court.
 4                      CROSS-EXAMINATION
 5  BY MR. QUINTERO:
 6  Q.  Doctor, you and I have never spoken before; is that
 7  correct?
 8  A.  Correct.
 9  Q.  You, yourself, do not handle clinical testing?  I thought
10  that's what I heard you say.
11  A.  No, I do not.
12  Q.  You, basically, gather reports and review them for the DEA;
13  correct?  Reports from other researchers is what I'm talking
14  about.
15  A.  Yes.
16  Q.  That's, in essence, what you do?
17  A.  Yes.
18  Q.  And obviously you, yourself, have not done any kind of
19  research on ethylone or the potency of ethylone; correct?
20  A.  Correct.
21  Q.  And when you said -- and maybe I misunderstood you, you
22  said that, in your opinion, ethylone had substantially a
23  similar effect on the human body as MDMA; did I hear you say
24  that?
25  A.  It's expected to have a stimulant effect.
```

Cross - Cassandra Prioleau, Ph.D.                    24

1   Q.   Now, you have absolutely no clinical data for that opinion;

2   correct?

3   A.   Correct.

4   Q.   You're basing your opinion on what you think may happen;

5   correct?

6   A.   It's an opinion based on some in vitro studies and based on

7   its structure.

8   Q.   Well, you received in vitro studies which you -- I think I

9   heard you say on direct examination that in vitro studies are

10  not a hundred percent reliable because it's done in a test

11  tube?

12  A.   Not that they're not 100 percent reliable; the information

13  that you -- you can only take certain types of information from

14  the in vitro studies.

15  Q.   Well, we provided to you through the Assistant U.S.

16  Attorney an in vitro study which shows that ethylone is less

17  potent than methylone, and you said that that was not reliable;

18  didn't you?

19  A.   In terms of extrapolating the potency that you would

20  actually see in a human.

21  Q.   But you now say that your opinion is based on in vitro

22  studies that -- by the way, did you produce those studies to

23  the prosecutor?

24  A.   Produce what?

25  Q.   The in vitro studies that you're relying on for your

Cross - Cassandra Prioleau, Ph.D.                    25

1   statement that ethylone is substantially similar to MDMA.

2   A.   I submitted a declaration and -- which is the basis of my

3   recommendation, my opinion.

4   Q.   You submitted the basis of your opinion, but did you send a

5   copy of the study that you -- the in vitro study that you're

6   relying on to the prosecutor?

7   A.   The studies are -- if they're available, they could be

8   publicly available; and if requested, I could provide the

9   studies.

10  Q.   Are they public?

11  A.   For ethylone, there is the similar studies tested which I

12  can base my -- it's a pharmacology, how it works in the body.

13  Q.   But my question to you was that we've submitted to you in

14  vitro studies showing that ethylone is actually less potent

15  than methylone.  You read it; correct?

16  A.   Correct.

17  Q.   And for some reason you don't agree with it?

18  A.   Not that I don't agree with it.  You're extrapolating that

19  study, which is an in vitro study, to the potency in a human.

20  And that you should not do, because that study represents only

21  one event that happens.  It's why you do these studies, so that

22  you know exactly how it works on this one system.

23       But the body represents several systems; and once the user

24  takes it, there are other systems that come into play that will

25  affect the potency.

 1          So it's better, if you want to do a -- get a recommendation

 2    on the potency to have an in vivo study, which is done in a

 3    living being, like in a whole animal or, of course, the Gold

 4    Standard would be a human.

 5    Q.   But there are no studies of that type done on ethylone;

 6    correct?

 7    A.   Correct.

 8    Q.   And so when you're saying that your opinion is based on an

 9    in vitro study, it's the same type of study that we submitted

10    to you; correct?

11    A.   It's more in terms of prong B, does it have a stimulant

12    effect; not on the potency.  That's what that study is good at

13    telling -- giving me information on.

14    Q.   I'm not talking about the substance of the study.  I'm

15    talking about the type of study.  It's identical to the one

16    that you're basing your opinion on.

17    A.   For prong B.

18    Q.   Is that correct?

19    A.   It does have a stimulant effect on the central nervous

20    system.

21    Q.   Is the documents that we submitted to you the same type of

22    research study that you are talking about when you said the

23    ethylone is substantially similar to MDMA?

24          That's all I'm asking you:  Is it the same type of study?

25    A.   Yes.  They're the --

Cross - Cassandra Prioleau, Ph.D.                    27

1   Q.   Basically?

2   A.   It's one of the studies that I have considered, yes.

3   Q.   Now, the bottom line here is that there is no statistical

4   data, there is no clinical data to support any opinions

5   concerning the potency of ethylone; correct?

6   A.   Correct, yeah.

7        MR. QUINTERO:  I have nothing further of this witness,

8   Your Honor.

9        MR. ABRAMS:  Just very briefly, Judge.

10                    CROSS-EXAMINATION

11  BY MR. ABRAMS:

12  Q.   Good morning, ma'am.

13  A.   Good morning.

14  Q.   And just following up on Mr. Quintero's last question to

15  you about there being a lack of statistical studies, the only

16  way to have a study that you could essentially base an opinion

17  with respect to potency on would being either those animal

18  studies or studies on people; correct?

19  A.   Correct.

20  Q.   So, as you sit here today, all right, having been someone

21  who has gone through and analyzed the reports that are

22  available to you, you can't tell us whether ethylone is more

23  potent, less potent, equally potent to any of these other

24  substances we're talking about, MDEA, MDMC, any of those?

25  A.   No, I cannot.

Redirect - Cassandra Prioleau, Ph.D.                28

1          MR. ABRAMS:  Thank you.

2          THE COURT:  Redirect?

3          MR. GYIRES:  Very briefly, Your Honor, to clarify

4    something.

                    REDIRECT EXAMINATION

6    BY MR. GYIRES:

7    Q.  You remember defense counsel asking you about in vitro

8    studies; right?

9    A.  Yes.

10   Q.  Okay.  And you mentioned -- you also recall you mentioning

11   two separate prongs in the guidelines?

12   A.  Yes.

13   Q.  Okay.  Are in vitro studies helpful to the second prong;

14   that is, effect on the human being?

15   A.  Yes.

16   Q.  Okay.  And are in vitro studies helpful to the potency of

17   the drug in a human being?

18   A.  So far, they have not been useful.

19   Q.  Okay.  And that article that defense is citing to talking

20   about one in vitro -- an in vitro study on ethylone, does that

21   article even claim anything about human beings, or is it just

22   saying -- or is it just talking about in vitro studies'

23   potency?

24   A.  It just talks about what type of effect that the substance

25   would have; like what systems does it work on, the mechanism of

Redirect - Cassandra Prioleau, Ph.D.                29

 1    action of the drug that it would have in a human body.

 2    Q.  But it's not claiming -- or is it -- let me ask you without

 3    leading you.

 4         Is it claiming that -- is that article claiming that the

 5    potency in human beings of ethylone is less than methylone?

 6    A.  No, it's not.

 7              MR. GYIRES:  Okay, I pass the witness to defense,

 8    Your Honor.

 9              THE COURT:  Thank you, Doctor.  You may step down.

10              (Witness excused.)

11              THE COURT:  All right.  Brief oral arguments or

12    submissions?  It's your motion.  Are you objecting to the PSI?

13              MR. GYIRES:  Yes, Your Honor.  I'll start with -- I

14    will try to make this very --

15              THE COURT:  Come up to the podium, yes.

16              MR. GYIRES:  Yes, Your Honor.

17         I will try to make this very brief.  Because it's been

18    briefed, I think the Court has a full understanding at this

19    point of what the argument is; but probation's determination of

20    1 to 250 was not based on any evidence that has not been

21    presented to the Court.  So it's not as if probation formed an

22    opinion with some other information.  Their opinion is formed

23    on the information that they had at the time of writing the

24    PSR.

25         Now that we have a fuller picture of all the issues,

Redirect - Cassandra Prioleau, Ph.D.                30

1    the Court has all the information it needs, regardless of what

2    probation assigned to it.

3           The Government has the burden.

4           And the three factual factors are, again: the chemical

5    structure, the effect on the user, and the degree of that

6    effect, which is potency.

7           The first two have been stipulated, and the witnesses

8    very briefly mentioned, in fact, that the listed drug that's

9    closest to ethylone is MDEA, in terms of chemical structure.

10   That was the chemist, the first witness.

11          The second prong also favors the Government: that the

12   effect on the user is predicted to be the same as MDEA.

13          So that leaves -- those two factors favor the

14   Government.  Those are not neutral factors.  Those are not

15   factors that favor the defense.  Those are two factors that

16   weigh in favor of the Government, of applying 1 to 500.

17          The question is:  What does the Court want to do with

18   the third factor, the unknown?  And maybe the question the

19   Court would have is, is -- well, what if it turns out to be a

20   higher potency or what if it turns out to be a lower potency?

21          And my response to that, Your Honor, is, because it's

22   an unknown, it's neutral, it doesn't favor either side.

23          So then the scales tip in favor of the Government.

24          These Molly pills, Your Honor, come from China -- it's

25   in the PSR.  They come from China.  The danger is that we don't

1    know what's in them.  The danger is that the young people

2    taking these pills don't know what's in them.

3          Because of the unknown, the unknown is precisely the

4    risk and the danger of the drug; it's not something that should

5    favor the defendant.

6          And because two factors favor the Government, the third

7    is an unknown, I think, common sense and logic would dictate a

8    1 to 500 ratio.  If the Court thinks that the guideline range

9    is too high, Your Honor can downwardly vary.

10          But to properly calculate the guideline range, we

11    should at least start there, and that's why we think it should

12    be 1 to 500.  Thank you.

13          THE COURT:  Thank you.  Counsel for the defense?

14          MR. QUINTERO:  May it please the Court, Your Honor, the

15    Government seems to forget what their standard of proof at a

16    sentencing is.  And as this Court knows, they have to prove by

17    a preponderance of the evidence the facts they want this Court

18    to find.

19          The issue of potency is a guess.  So if we are to look

20    at it in terms of standards of proof, that guess does not rise

21    to the level of probable cause, let alone a preponderance

22    standard.

23          What probation did, I believe, is what the appellate

24    courts have been telling the district courts - or suggesting to

25    the district courts - they do in situations where it is an

1    unknown.  It tells us to act conservatively, to be fair, to be

2    reasonable -- and I've cited the case law in my memorandums for

3    Your Honor -- and come up with a fair and reasonable estimate.

4              And I think that's what probation did in this case.

5              We had wanted, originally, a 1 to 125 ratio mainly

6    because the so-called "in vitro study" that we provided

7    indicated that ethylone may be less potent than methylone.

8              Probation, I believe, took -- and I'm not speaking for

9    them, but I think this is what happened.  They saw that we were

10   asking for a 1 to 125.  They saw the MDEA at 1 to 500.  And

11   because there was no, quote/unquote, statistical data or

12   clinical research or any kind of information that would allow

13   them to actually compare to the one or the other, they took the

14   middle-of-the-road approach and they took a 1 to 250.

15             We didn't object for the simple reason that that ratio

16   has absolutely no effect on the guidelines for my client.  One

17   to 125, 1 to 250, doesn't change anything.

18             I think that based on the limited information that this

19   Court has, I think the Court should follow the Eleventh Circuit

20   case law and take a very conservative approach.  If later on

21   the Government finds data that can -- that will affect other

22   cases, no question about it; but with the limited information

23   and the situation that this Court finds itself in, I think the

24   correct process would be, considering the standard of proof

25   that the Government must meet, that the Court should take a

```
  1    very conservative approach and use the 1 to 250 ratio that

  2    probation has recommended.  Thank you, Your Honor.

  3              THE COURT:  Mr. Abrams?

  4              MR. ABRAMS:  Yes, sir.

  5              Your Honor, initially, I echo and adopt the comments

  6    made by Mr. Quintero on behalf of Mr. Valdes.

  7              Judge, I would point out with respect to the proof and

  8    one of the first points that Mr. Quintero made, the Government

  9    has the burden of proving -- of introducing, quote/unquote,

 10    sufficient and reliable evidence to prove the necessary facts

 11    by a preponderance of the evidence.  That's United States

 12    versus Washington, 714 F.3d at 1558, that's a 2013 case,

 13    decided in this circuit.

 14              And when discussing what is sufficient and reliable,

 15    Judge, you just heard a Government concession regarding a

 16    critical point in this case; that being element number three of

 17    application note six pertaining to potency.

 18              And the Government says, We don't know.  We don't know

 19    what's in them -- meaning the pills -- it's unknown.  And the

 20    Government then wants to put the burden on the defendant here,

 21    heavy burden shifting, for the defense to then prove that

 22    these -- the substance is less potent than this MDEA, which the

 23    Government would ask Your Honor to adopt in the ratio of 1 to

 24    500 as opposed to 1 to 250.

 25              The Government has argued that the first two elements
```

 1   in regard to the application note are resolved in the

 2   Government's favor.  And, in fact, we have stipulated that, as

 3   to chemical structure and as to stimulant effect, that, in

 4   fact, that is true.

 5          However, Mr. Gyires argues to Your Honor that

 6   apparently this is a strong -- very strong, overwhelming,

 7   perhaps beyond-a-reasonable-doubt showing, and demonstrates to

 8   Your Honor with respect to the strength of the substance.

 9          We would suggest to Your Honor that those two elements

10   weigh perhaps slightly in favor of the Government.

11          The MDEA, the MDMC, MDMA, they're all part of the same

12   family.  And as you heard as to the MDEA, there's a one atom

13   difference with respect to one substance.  Well, they're all

14   part of the same drug family.

15          With respect to the stimulant effect, the testimony you

16   heard was the effect is predicted to be the same.  But, Judge,

17   what is lacking here is any kind of empirical data with respect

18   to studies done -- either on animals and/or people -- which

19   tell you what the potency of these drugs are.

20          Judge, we can put two drinks in front of us; both are

21   rum drinks, one with Bacardi 151 and the other one with Bacardi

22   Superior.  They are both rum.  They are both part of the same

23   family, rum drinks.  One has a potency or a proof of 151, which

24   is 75 percent alcohol; the other one has a potency of 79 proof,

25   or, roughly, 40 percent alcohol.  They are both rum.  One is

Redirect - Cassandra Prioleau, Ph.D.                    35

 1    considerably less potent than the other.

 2            The burden of proof here, Judge, is on the Government.

 3            And although in terms of the guidelines and what we

 4    see, there isn't, perhaps, when we see day-to-day a substantial

 5    difference in respect to my client's life, it's a difference of

 6    13 months at the low end of the guidelines, which to him is

 7    extremely substantial.

 8            And, Judge, here, when we are talking about people's

 9    lives and how much jail time they're going to serve, that can't

10    be based on an unknown.

11            And here you have a critical element of the

12    Government's proof which is unknown; that being the potency.

13            And where there is that lacking element and where the

14    consequences are so dire, if you will, perhaps down the road

15    there will be empirical data which supports the Government's

16    view.  It does not exist now.  And where it doesn't exist now,

17    we err on the side of caution, we err on the side of being

18    conservative; we go with the Government's recommendation, which

19    is, comparing the controlled substance to MDMC or methylone,

20    and its 1 to 250 ratio.  And we ask that the Government's

21    objection be overruled.

22            THE COURT:  All right.  Thank you.  All right.

23            Based upon the record that has been established on this

24    issue of the Government's objection to the pre-sentence

25    investigation report in dealing with the ratio to be assigned

1    to this drug called ethylone, E-T-H-Y-L-O-N-E, which is not

2    listed, apparently, in the sentencing guidelines; but with

3    regard to that issue, the Court finds that the Government has

4    established by reasonable and reliable expert opinion that the

5    ratio should be 1 to 500 and, therefore, the objection to the

6    probation officer's report and recommendation of a ratio of 1

7    to 250 is sustained, and the calculation of the pre-sentence

8    investigation report to the Court of computing of the ethylone

9    evaluation or value to be assigned to this ethylone substance,

10   as reflected in the blue sheets that have been given to the

11   Court in the case of the two defendants in this case, shall be

12   recalculated, and I will ask them to do that in connection with

13   discussions with the lawyers in the next five minutes.

14           I'm going to take a recess.

15           What I'm saying is, I'd like the probation officer to

16   recalculate advisory guidelines provisions utilizing the

17   formula -- the ratio that I have found to be the formula to be

18   applied in this case.  I think it will be a simple matter with

19   respect to one of the defendants and may be more complicated

20   with the other one; but I will instruct the lawyers to meet

21   with the probation officer, who's here in court, and calculate

22   that for me and be able to supply that to me when I come back

23   in five minutes, ten minutes.

24           If you need longer, of course, take longer; and then,

25   give me that recommendation so that I can make the appropriate

 1    findings about the guideline range.  All right?

 2          The Court finds that the three factors that the Court

 3    must consider have been considered.  The first two factors

 4    under this evaluation were not in contest; it was the third

 5    factor that was in contest.

 6          The Court finds that the substance ethylone is

 7    appropriately and more properly considered in relation to the

 8    listed substance of MDEA and otherwise.

 9          So, therefore, the objection of the Government is

10    sustained and the parties are instructed to recalculate the

11    guideline range and advise the Court of that when we return

12    after the recess.

13          We'll take a short recess.

14          COURTROOM DEPUTY:  All rise.

15          Court is in recess.

16          (Recess taken from 11:18 a.m. to 1:40 a.m.)

17          COURTROOM DEPUTY:  All rise.

18          THE COURT:  Thank you.  Be seated.  Could you -- to the

19    probation officer, have we recalculated the formula?

20          THE PROBATION OFFICER:  Yes, Your Honor.  Danielle

21    Sylvester-Pierre on behalf of U.S. Probation.

22          Regarding Mr. Sanchez Brey, the total offense level is

23    23.  The criminal history category --

24          THE COURT:  Now, excuse me.  I'm sorry to interrupt

25    you, but regarding which defendant?

```
 1              THE PROBATION OFFICER:  Mr. Sanchez Brey, the total

 2    offense level is 23.  The criminal history category is 3.

 3              THE COURT:  The total offense level?

 4              THE PROBATION OFFICER:  Is 23.  The criminal history

 5    category is 3.  Advisory guideline imprisonment range is 57 to

 6    71 months.  The advisory fine range is 10,000 to one million

 7    dollars.  And supervised release remains the same.

 8              As to Mr. Valdes --

 9              THE COURT:  All right.  Now just a minute.  Let me

10    get -- let me find Valdes.

11              Yes, ma'am?

12              THE PROBATION OFFICER:  The total offense level is 23.

13    The criminal history category is 4.  Advisory guideline

14    imprisonment range is 70 to 87 months.  And advisory fine range

15    is 10,000 to one million dollars.  Supervised release remains

16    the same.

17              THE COURT:  Thank you, very much.

18              THE PROBATION OFFICER:  You're welcome.

19              THE COURT:  All right.  Counsel have heard the

20    calculation of the probation officer.

21              Is there any objection to the guideline range, other

22    than and except what has already been discussed regarding the

23    formula that we've talked about, the ratio; other than that, is

24    there anything else that -- to which you have an objection to

25    the pronouncement by the probation officer to the Court?
```

1           MR. ABRAMS:  No, sir, the guidelines are correct.

2           MR. QUINTERO:  No, Your Honor.  On behalf of

3    Mr. Sanchez Brey, no.

4           THE COURT:  I want the record to be quite clear:  All

5    the objections heretofore made both in pleadings and in oral

6    submission are fully reserved to be raised on appeal, should

7    that be necessary, the objections here before me.

8           But based upon the Court's ruling and the calculation

9    of the probation officer in consultation with counsel, the

10   Court then finds that with respect to the defendant Valdes, the

11   guideline range is offense level 23, criminal history category

12   4, with an advisory custody range of 70 to 87 months.

13          With respect to the defendant Brey, the total offense

14   level is 23, and criminal history category 3, with an advisory

15   range of 57 to 71 months.

16          The Court is inclined to the view at this point, prior

17   to hearing from counsel, that the sentence should probably be

18   at the low end of the guideline range.  But I will listen to

19   the attorneys and see what your positions are now with relation

20   to the sentence to be imposed.  And whoever wishes to go first.

21          Perhaps I should hear from the Government.  Let me

22   see -- pardon me, Mr. Abrams.

23          MR. ABRAMS:  Yes, sir.

24          THE COURT:  Mr. Gyires?

25          MR. GYIRES:  Yes, Your Honor.

 1        For defendant Valdes, the Government recommends the low

 2   end, 70 months.

 3        For the second defendant, defendant Sanchez Brey, we

 4   did file a motion for downward departure under 5K1.1 for

 5   substantial assistance.  And we're recommending -- based -- I

 6   can outline the facts that form the basis for that again,

 7   Your Honor, but we're recommending a 25 percent departure,

 8   which is -- we're recommending a sentence of 43 months for

 9   Mr. Sanchez Brey.

10        THE COURT:  All right.  Well, we'll take whichever one

11   would like to go first.  Mr. Abrams is standing.

12        MR. ABRAMS:  Yes, sir.

13        THE COURT:  Mr. Abrams represents in this case

14   Mr. Valdes.

15        MR. ABRAMS:  Yes, sir.

16        THE COURT:  All right.

17        MR. ABRAMS:  Judge, we respectfully are going to --

18   like to ask Your Honor to consider exercising your discretion

19   under 18 U.S.C. Section 3553 of which the pre-sentence report

20   and advisory guidelines are only one part, and consider

21   sentencing Mr. Valdes to the custody of the Bureau of Prisons

22   for a term of 57 months.

23        We note that 57 months would have been the low end of

24   the guidelines --

25        THE COURT:  They're recommending 43 months.

1          MR. ABRAMS:  That's not to my client.  My client,

2     they're recommending 70 months, Judge.

3          THE COURT:  You represent Mr. Valdes --

4          MR. ABRAMS:  Yes, sir.

5          THE COURT:  -- with a range of 70 to 87 months.

6          MR. ABRAMS:  Yes, sir.

7          THE COURT:  And the Government is recommending 43

8     months.

9          MR. ABRAMS:  No.  As to Mr. Valdes, the Government's

10    recommending 70 months.

11         THE COURT:  Pardon me.

12         MR. ABRAMS:  Yes, sir.

13         THE COURT:  All right.  Let me get a new, clean sheet

14    of paper here.

15         Now you're inviting my attention to the provisions of

16    Section 3553.

17         MR. ABRAMS:  Yes, sir.

18         THE COURT:  And you're about to suggest the grounds.

19    Go ahead.

20         MR. ABRAMS:  Yes, sir.  Judge my recommendation to

21    Your Honor for Mr. Valdes is a sentence of 57 months.

22    Fifty-seven months would have been the low end of the

23    guidelines had the Government's objection been overruled.  That

24    was the guidelines that were previously in the pre-sentence

25    report.

Redirect - Cassandra Prioleau, Ph.D.                    42

1              And I ask you to consider that for several reasons.

2    First -- and certainly we're not going to re-argue or

3    re-litigate now the issue regarding ethylone; but clearly, as

4    Your Honor heard, this is an issue which is kind of up in the

5    air right now, and there absolutely is nothing out there right

6    now with respect to potency.  And who knows what's going to

7    happen down the road.

8              Second, and turning more to the human factors and with

9    respect to the unknowns with respect to this drug ethylone and

10   the potential future studies that may come out, the difference

11   here that we are asking for is essentially two offense levels,

12   13 months difference.

13             And, again, this is -- we're talking now human time as

14   opposed to numbers and guidelines and the books and

15   calculations; but 13 months out of this man's life and 57

16   months is still a very substantial sentence.

17             Another ground would be sentencing disparity.  We

18   understand what the Government's recommendation is in regard to

19   the codefendant.  We understand that the codefendant is the

20   beneficiary of a substantial assistance motion which we are not

21   going to receive.

22             I would point out to Your Honor that we attempted to do

23   what we could do on behalf of Mr. Valdes.  And Mr. Valdes sat

24   down for three hours with four agents and, unfortunately,

25   nothing was able to come of that, but it's not because he

 1  didn't try.  And he is not getting a motion for what he did and

 2  what he tried to do.

 3          And I would point out that, even if -- you know, even

 4  if Your Honor grants our request for the variance and comes

 5  down to 57, that Mr. Brey, the codefendant, if Your Honor

 6  adopts the Government's recommendation -- and I anticipate

 7  Mr. Quintero's going to ask for less time -- then the

 8  Government's recommending 45 months; Mr. Valdes is still going

 9  to be doing a year more than his codefendant.

10          So -- and then pointing out other factors, I would just

11  point out Mr. Valdes is recently married.  His wife, Susanna

12  Subey (ph), is sitting in the courtroom.  She submitted a

13  statement to Your Honor.  I'm not going to ask her to talk.

14  She would basically repeat what is in her letter.  And, of

15  course, she is here in support of her husband.

16          Mr. Valdes' father, Herberto Valdes, came to court last

17  time when we had our sentencing hearing part one.  He is in

18  poor health, he was unable to attend today.  He otherwise would

19  be here also in support of his son.

20          And, finally, I point out, Judge, that Mr. Valdes has

21  been on bond pretty much throughout this case under very strict

22  conditions of house arrest.  And, essentially, if Mr. Valdes

23  had been under the same restrictions at the end of his sentence

24  instead of as a condition of bond, the manner and means by

25  which he was restricted would have counted toward service of

1    his sentence.

2           However, because this is a condition of release, the

3    time which Mr. Valdes has spent in the custody of his home, if

4    you will, does not count.

5           So, Judge, in light of all these circumstances, the

6    attempts at, quote/unquote, doing the right thing; the unknown

7    nature with respect to this controlled substance as to potency;

8    and sentencing disparity purposes, we would ask Your Honor to

9    come down two offense levels, breaks it down to 57 months.  We

10   ask you to sentence him to 57 months, a term of supervised

11   release as Your Honor deems appropriate.

12          THE COURT:  All right.  Thank you.

13          MR. ABRAMS:  Yes, sir.

14          THE COURT:  Mr. Gyires, with respect to this defendant?

15          MR. GYIRES:  I don't have anything to add, Your Honor,

16   that's not in the PSR.  It accurately represents their criminal

17   histories and the facts of this case, Your Honor.

18          THE COURT:  Can you talk to me and tell me your

19   response to the argument that disparity is -- between

20   sentencings, particularly in the same case, is to be avoided,

21   if that's possible.  The Court is to strive for reasonable --

22   and to avoid disparity between the two.  That's the arguments

23   made.

24          What is the Government's position on that?

25          MR. GYIRES:  The disparity here is because of two

1    things:  One, the criminal histories.  Mr. Valdes is at a

2    criminal history category 4 and Mr. Brey is at a category 3.

3    That accounts for a slight difference.

4         The other difference is the Government's downward

5    motion for the second defendant because he helped in the arrest

6    of Mr. Valdes.  That's the real difference, Your Honor.

7         THE COURT:  Otherwise, they're the same.  They

8    committed the same criminal conduct, there's no difference

9    there; it's just the criminal history and the assistance of the

10   Government.  Is that it?

11        MR. GYIRES:  Yes, Your Honor.

12        THE COURT:  Basically?

13        MR. GYIRES:  Basically, yes.

14        THE COURT:  All right.

15        I will now -- before proceeding with this one, I will

16   hear with respect to -- I will consider the matter with respect

17   to Mr. Brey.

18        MR. QUINTERO:  Thank you, Your Honor.  If it please the

19   Court.

20        The original guideline sentence in this case was 46 to

21   57 months.  And the Government had filed their motion for

22   reduction of sentence pursuant to 5K1.1, recommending a 25

23   percent.  Based on my calculations, that would have brought a

24   sentence of about 35.5 months in prison.

25        The guidelines have now changed based on the Court's

1    ruling, and now my client is at a two-level higher range and

2    the Government is still recommending a 25 percent reduction,

3    which puts him at 43 months --

4            I think, Mr. Gyires.

5            -- at 43 months.

6            So, in essence, my client's cooperation from the

7    original guideline sentence has a value of three months,

8    according to the Government.  In other words, the original

9    guideline sentence was 46 months, at the low end; now the

10   Government is recommending a 43-month sentence.

11           THE COURT:  Forty --

12           MR. QUINTERO:  Forty-three month's sentence,

13   Your Honor.

14           The standards in this district are well known.  When a

15   defendant is prepared to testify in the course of a cooperation

16   agreement with the Government, and the defendants in the case

17   plead guilty, the normal recommendation is usually about a

18   third.

19           When a defendant places his life on the line and risks

20   his life, either in the course of either an undercover

21   operation or testifies when there are threats made to him or

22   his family, that recommendation goes up to, approximately, 50

23   percent.  At least that's been my experience, and I think that

24   has been the experience of Your Honor, having been the Chief

25   Judge here for many years.

1          Mr. Brey actually sits in the category of he placed his

2    life on the line.  Mr. Brey's involvement in this case was

3    originally the go-between -- in other words, the person that

4    put the confidential source together with the person that owned

5    the drugs.  He was the middleman.

6          In relation to his cooperation with the Government in

7    this case, he actually went and put himself on the line in the

8    course of the arrest of the codefendant.  So I don't believe

9    that 25 percent is a reasonable amount of a reduction

10   considering what he exposed himself to.

11         I also think that when you look at the increase in the

12   guidelines, a recommendation of 43 months is, in essence,

13   paying lip service to the defendant's cooperation.

14         I put in my memorandum that I felt that a sentence

15   between 24 and 30 months, somewhere in that range, would be the

16   appropriate sentence in this case.  And I normally don't make

17   recommendations to this Court because I've been before

18   Your Honor for many, many years, and I've always trusted you to

19   make the right decisions, as I do today.

20         But in this case, I felt compelled to make that

21   recommendation because I wanted the Court to see the difference

22   between what his cooperation is worth from the original

23   guideline sentence to now, with the increase, he's basically

24   not getting anything for his cooperation.

25         The pre-sentence report indicates that Mr. Brey was

Redirect - Cassandra Prioleau, Ph.D.                    48

1   abandoned by his father at an early age, at the age of,

2   approximately, 15 years of age.  He's lived with his mother.

3   His girlfriend is here.  She's been supportive of his

4   situation.  She knows that he's going to jail.

5            The question is, for how long?

6            And so, Your Honor, the defendant has tried to make

7   right.  He does have a drug problem.  He has been pretty

8   good -- or very good, should I say.  Pretrial Services indicate

9   that he has not had a positive drug result in the entire time

10  that he has been on Pretrial Services review.

11           And so, whatever sentence this Court imposes, I would

12  also ask that the Court recommend the drug program for

13  Mr. Sanchez Brey.

14           You know, he does have a criminal history, and I

15  explained to him this Court will sentence him to jail.

16           I think the current range and the recommendation by the

17  Government is somewhat inappropriate considering the

18  cooperation and what he did for the Government in this case.

19           THE COURT:  All right.  Thank you.

20           MR. QUINTERO:  Thank you, Your Honor.

21           THE COURT:  Does the Government have anything in brief

22  rebuttal to either one?

23           MR. GYIRES:  I don't have much to say, Your Honor,

24  other than the 25 percent is, in my three years of being here,

25  consistent with what my office typically recommends in these

Redirect - Cassandra Prioleau, Ph.D.                    49

1    types of cases.  And the 25 percent has been our recommendation

2    from the beginning.  So he's getting more than a year credit

3    based on our recommendation for what he did.

4            That's all I have.

5            THE COURT:  Thank you.  All right.

6            We will take up the matter of the defendant Brey, Adiel

7    Sanchez Brey, if you stand where you are:

8            The Court has considered the statement of all parties,

9    pre-sentence report which contains the advisory guideline range

10   and the statutory factors.  We've also considered the 5K1

11   motion made by the Government and the Government's

12   recommendation.

13           The Court approves the recommendation of the Government

14   in the sense of a downward departure.  The amount is contested

15   between the parties as to what that should be.

16           It is the judgment of the Court that, with respect to

17   the defendant Brey, that the Court will honor and accept and

18   make a downward departure, and the Court does commit you to the

19   Bureau of Prisons for a period of 43 -- 43 months as to

20   Count 1, followed by three years' supervised release, during

21   which you are subject to being surrendered to immigration for

22   removal.

23           You will -- recommend substance abuse counseling and

24   treatment while you're in custody; and recommend, following

25   that, that you get that upon release.  I impose the

1   self-employment restriction -- and that's it -- no, I do not.

2   No permissible search.  But the $100 assessment is ordered.

3          The defendant is advised under the -- he has a right to

4   appeal within 14 days.  If he cannot afford a lawyer, one will

5   be appointed for him.

6          The matter of the Jones hearing, I make inquiry of the

7   defendant and his counsel as to whether there's any objection

8   to the Court's findings of fact or the manner in which sentence

9   was pronounced, you need not repeat what you've already made a

10   part of this record.  That is all preserved to you for raising

11   on appeal if it should be necessary.  But anything other than

12   the difference between -- any objection under Jones to the

13   sentencing which was pronounced, Mr. Quintero?

14          MR. QUINTERO:  No, Your Honor.

15          THE COURT:  And the defendant, any objection?

16          DEFENDANT BREY (Through the interpreter):  No.

17          THE COURT:  All right.  I've advised you about the

18   right to appeal.

19          Now, a matter of any motions, Mr. Quintero, on behalf

20   of your counsel about the time for reporting or any motions

21   for -- released for a period of time.  What is your motion?

22          MR. QUINTERO:  Thank you, Your Honor.

23          I spoke to Mr. Gyires, and we will be requesting a

24   voluntary surrender, which I believe the Government will not

25   oppose, the recommendation to allow the defendant to

1    voluntarily surrender.

2          MR. GYIRES:  That's fine, Your Honor, if the Court's

3    okay with it.

4          THE COURT:  All right, then.  Joyce, let's -- what

5    period of time?  About 30, 45 days, would that --

6          MR. QUINTERO:  Whatever the Court feels is reasonable,

7    Your Honor.  I think, from what I understand, the Bureau of

8    Prison has taken about four week to six weeks to designate

9    individuals to their designated facilities, so I think 45 days

10   will be fine.

11         THE COURT:  All right.  Joyce, 45 days.  What would be

12   the date?

13         COURTROOM DEPUTY:  February 18, 2015, at 12:00 noon.

14         THE COURT:  The motion for the defendant be at liberty

15   pending reporting to the Bureau of Prisons for commencement of

16   service to the date just announced by the courtroom deputy is

17   granted.

18         Mr. Quintero, you will carefully advise him that any

19   failure to appear is another violation, a serious matter, so he

20   must appear on the date specified just now.

21         If the Bureau of Prisons has not designated a place for

22   confinement, the defendant shall submit himself to the U.S.

23   Marshal Service here at the United States Courthouse in Miami,

24   Florida, at the Marshal's office at 12:00 noon -- it's a

25   Wednesday, 12:00 noon on that date.

```
 1              MR. QUINTERO:  Yes, sir.

 2              THE COURT:  Now, is there -- and the bond he's

 3    heretofore posted will be in full force and effect conditioned

 4    on his faithful appearance at the time specified.

 5              Now, is there any motion about the place of

 6    confinement?

 7              MR. QUINTERO:  Your Honor, recommendation from the

 8    Court in the Southern District of Florida or in Florida will be

 9    fine.

10              THE COURT:  I will make that recommendation.

11              You also had referred earlier in the hearing today

12    about treatment for -- drug treatment, I believe, and that

13    motion -- am I correct?

14              MR. QUINTERO:  Yes, Your Honor.

15              THE COURT:  That motion is granted, and the Court will

16    recommend to the Bureau of Prisons a facility located in the

17    Southern District of Florida, and recommend drug treatment.

18    All right.

19              The defendant then is released -- or will be as soon as

20    we deal with the other motion, the other sentencing, be

21    released on the bond heretofore posted.

22              MR. QUINTERO:  Yes, sir.  Thank you, Your Honor.

23              THE COURT:  All right.  Now, with respect to

24    Mr. Abrams' client, that would be Mr. Valdes, I do not know

25    whether I asked Mr. Gyires about his rebuttal on Valdes or not.
```

1       Is there anything further the Government briefly has to

2  say with respect to Valdes?

3       MR. GYIRES:  I did reply, Your Honor, and I don't have

4  anything to add.

5       THE COURT:  All right.  The matter of Valdes and the

6  argument of counsel, Mr. Abrams, to treat the parties in as

7  nondisparate a method as reasonable makes a lot of sense to the

8  Court.  The criminal activity involved is basically the same.

9       It is true and correct that Mr. Brey cooperated,

10 apparently, substantially with the Government.  It is also true

11 and correct that Mr. Valdes' criminal history category is

12 substantial and that that warrants a different treatment

13 between the two.

14      But I think that a period of time of sentencing the

15 defendant to the -- to a period that is less than the low end

16 of the guideline range, which right now is 70 months, to a

17 period less than that is warranted under Section --

18      MR. ABRAMS:  3553, Judge.

19      THE COURT:  Yeah, I got it right here, 18 U.S.C.

20 Section 3553.  So it is upon that basis that the Court

21 determines that the sentence -- the motion for reduction or for

22 departure from the guidelines from the 70 months low end to a

23 period of 57 months is warranted.

24      This still recognizes that there is a difference in the

25 treatment of the two defendants for the same criminal conduct,

 1    approximately, the same, of 14 months.  I think that's

 2    warranted.  I think that complies with the sense and meaning of

 3    18 U.S.C. 3553 to make the sentences for the same conduct as

 4    nearly reasonably consistent and to avoid disparity as is

 5    possible.

 6          In any event, it's the judgment of the Court that you,

 7    Li Valdes, are committed to the Bureau of Prisons for a period

 8    of 57 months as to Count 1 of this indictment, followed by

 9    three years' supervised release, during which you shall not

10    commit any other crimes; you're not permitted to possess a

11    firearm or any other dangerous device; shall not possess a

12    controlled substance; shall cooperate in the detection of DNA,

13    and comply with all standard conditions of probation of the

14    Southern District of Florida.

15          By the way, going -- momentarily interrupting and going

16    back to the sentence of Mr. Brey, under the supervised release,

17    Mr. Brey, who's still in court, and his counsel, you are

18    ordered to -- while on supervised release, you shall not commit

19    any crimes; you're prohibited from possessing a firearm or

20    dangerous device or any controlled substance; cooperate in the

21    collection of DNA, and comply with all the standards and

22    conditions of supervised release, including mental health

23    treatment, statistical abuse treatment, no new debt structure,

24    self-employment restrictions.

25          Mr. Quintero, those are routine matters I should have

1    included and failed to do so, but please advise your client of

2    those matters.

3             MR. QUINTERO:  Of course, Your Honor.

4             THE COURT:  You know what I'm talking about.

5             MR. QUINTERO:  Yes, sir, of course.

6             THE COURT:  Going back to this sentencing, Mr. Abrams,

7    on your client, Mr. Valdes, I've imposed those conditions, and

8    he shall comply with all these conditions of the Southern

9    District of Florida, including mental health treatment,

10   substance abuse treatment, no new debt, self-employment

11   restriction.

12            All right.  The defendant -- I make the inquiry under

13   Jones:  Any objection to the sentence or the manner in which it

14   was pronounced?

15            MR. ABRAMS:  Nothing in addition, Judge.

16            THE COURT:  I meant in addition to what you already

17   argued, which is fully preserved in the record.

18            MR. ABRAMS:  Yes, sir.

19            THE COURT:  I ask the defendant:  Any objection under

20   Jones?

21            DEFENDANT VALDES (Through the interpreter):  No, sir.

22            MR. ABRAMS:  No, Judge.

23            THE COURT:  Mr. Valdes was advised he has a right to

24   appeal within 14 days.  If he cannot afford a lawyer, one will

25   be appointed for him.

Redirect - Cassandra Prioleau, Ph.D.                    56

```
 1            Any motions regarding --

 2            MR. ABRAMS:  Yes, sir.

 3            Judge, first, may we have a recommendation of

 4   participation in the Bureau of Prisons 500 hours substance

 5   abuse program during Mr. Valdes' term of incarceration.

 6            THE COURT:  You have no objection to that?

 7            MR. GYIRES:  No, Your Honor.

 8            THE COURT:  Motion is granted.

 9            MR. ABRAMS:  Thank you, Judge.  And may we also have

10   recommendations to the Bureau of Prisons of facility for

11   incarceration of FCI Miami No. 1, FCI Coleman No. 2.

12            THE COURT:  Without objection, those motions are

13   granted.

14            MR. ABRAMS:  Thank you, Judge.

15            THE COURT:  Now, surrender.

16            MR. ABRAMS:  Judge, may we have -- we're not asking as

17   much time as Mr. Brey.  We would ask Your Honor for seven days,

18   and surrender next Wednesday to the U.S. Marshal here in Miami.

19            THE COURT:  All right.  Well, does the Government have

20   any objection?

21            MR. GYIRES:  No, Your Honor.

22            THE COURT:  The motion is granted.  Surrender will be

23   12:00 noon.  The date?

24            MR. GYIRES:  That would be the 14th, Judge.

25            COURTROOM DEPUTY:  January 14, 2015.
```

1        THE COURT:  All right.  At the U.S. Marshal here in the

2   Southern District of Florida.  All right.

3        There were no other --

4        MR. GYIRES:  One other item, Your Honor.

5        The defendant, just briefly -- they both pled to

6   Count 1 of the superseding information, which just reflected

7   the specific drug; so I would just move to dismiss the

8   remaining counts of that superseding information as well as the

9   underlying indictment altogether.

10       THE COURT:  That motion is granted.

11       And if you, Mr. Gyires, will have someone prepare a

12   short order, a written order.

13       MR. GYIRES:  Yes, Your Honor.

14       THE COURT:  At your convenience.

15       All right.  We'll be in recess.

16       COURTROOM DEPUTY:  All rise.  Court is in recess.

17       (Proceedings concluded at 12:17 p.m.)

18                    C E R T I F I C A T E

19        I hereby certify that the foregoing is an
         accurate transcription of the proceedings in the
20       above-entitled matter.

21

         January 9, 2015    /s/Glenda M. Powers
22       DATE                GLENDA M. POWERS, RPR, CRR, FPR
                             Official Federal Court Reporter
23                           United States District Court
                             400 North Miami Avenue, N809
24                           Miami, Florida 33128

25